

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JMM:BTR
2010R002238
HottonDet.ltr

*United States Attorney's Office*
*610 Federal Plaza*
*Central Islip, New York 11722-4454*

October 15, 2012

Honorable Arlene R. Lindsay
United States Magistrate Judge
United States District Court
Eastern District of New York
814 Federal Plaza
Central Islip, New York 11722

> Re: United States v. Mark Hotton, et al
> Criminal Docket No. 12 Cr 649 (JS)

Dear Judge Lindsay:

The government respectfully submits this letter with regard to the pre-trial detention of the defendant Mark Hotton ("Hotton") in the above-captioned matter. For the reasons detailed below, the government requests that a permanent order of detention be issued as to the defendant Hotton pursuant to 18 U.S.C. § 3142(e). Furthermore, the government requests leave to make appropriate bail recommendations as to co-defendants Sherri Hotton, Mariann Mextorf, Denise Labriola, and Michael Scibelli, who were also arrested this morning by federal agents in connection with the above-captioned indictment.[1]

I.   SUMMARY OF PENDING CHARGES

The E.D.N.Y. Indictment

On October 11, 2012, the grand jury in the Eastern District of New York returned the above-captioned indictment, charging Hotton and five others with conspiracy to commit wire fraud and to launder money. Those charges arose from a false invoice scheme that Hotton engineered from 2008 through 2010 in which he and his co-conspirators obtained over $3.7 million in stolen funds. The funds were then laundered though a complex network of shell companies and transactions, as described further below, to disguise their source and frustrate efforts by victims to recover their money from Hotton.

---

[1] Defendant Blass is a fugitive.

2

## The S.D.N.Y. Criminal Complaint

On October 12, 2012, a criminal complaint was filed against Hotton in the Southern District of New York charging him with two separate wire frauds.  United States v. Mark Hotton, 12 MAG 2686(RLE)(SDNY).  Count One arises from Hotton's recent scheme to defraud the producers of the Broadway show "Rebecca," a fraud that resulted in the collapse of the $12 million musical. Hotton is also charged with defrauding a Connecticut real estate company, obtaining over $750,000 in "fees" in the process.

Hotton now stands charged in two federal districts with defrauding victims throughout the United States of more than $4.4 million in just the last four years.  As discussed below, the defendant, and others, remain under investigation for additional frauds involving up to $15 million in losses to victims, the disposition of those funds remains unknown.

## II.   RELEVANT LEGAL STANDARDS FOR DETENTION

"The Bail Reform Act authorizes pretrial detention upon the court's finding that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community.'" United States v. Agnello, 101 F. Supp.2d 108, 109 (E.D.N.Y. 2000).  At a detention hearing, the Court shall consider, among other factors, "the available information concerning --"

> (1)   The nature and circumstances of the offense charged;
>
> (2)   the weight of the evidence against the person;
>
> (3)   the history and characteristics of the person, including --
>
> > (A) the person's character, . . . , past conduct, history relating to drug and alcohol abuse, criminal history, and record concerning appearance at court proceedings . . . ; and
> >
> > (B) whether, at the time of the current offense . . . , the person was on . . . probation  . . or on other release . . . for an offense under Federal, State, or

local law; and

(4)   the nature and seriousness of the danger
      to any person or the community that
      would be posed by the person's release.

18 U.S.C. §3142(g).

        Detention may be ordered on risk-of-flight grounds if
the government establishes such grounds by a preponderance of the
evidence.  United States v. Chimurenga, 760 F.2d 400, 405-06 (2d
Cir. 1985).  Detention may be ordered on dangerousness grounds
if the government establishes such grounds by clear and
convincing evidence.  See 18 U.S.C. § 3142(f)(2).  The rules
governing admissibility of evidence at trial, however, do not
apply in a detention hearing.  Id.; Fed.R.Evid. 1101(d)(3).
Accordingly, the government submits this evidence by way of
proffer.  See United States v. LaFontaine, 210 F.3d 125, 130-31
(2d Cir. 2000) (explaining that the government is entitled to
proceed by proffer in a detention hearing); United States v.
Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States
v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

III.  ARGUMENT

        Factors To Be Considered

        The nature and circumstances of the offenses charged
weigh heavily in favor of detention for defendant Hotton.  In
connection with the indicted case, special agents of the Internal
Revenue Service ("IRS") have conducted a forensic accounting
analysis of transactions and bank accounts known to be under the
control of Hotton and others.  That analysis reveals transactions
similar to a Ponzi scheme in that a portion of money stolen from
certain victims has been used to pay others.  However, unlike a
traditional Ponzi scheme, using just one company to defraud
investors, Hotton created a web of shell companies, fraudulent
investment schemes and interrelated transactions devoted to
disguise his crimes, hide the profits of his crimes, and evade
discovery by victims, regulators and law enforcement.

        Agents who have conducted forensic accounting analysis
of HOttons various entities have observed that money stolen in
one particular fraud would be deposited into one company account,
then transferred to a second company, which in turn would then
transfer the funds back to the original depositing company, often
falsely identifying this transfer as a return on a non-existent
loan among Hotton entities.  Upon re-deposit, agents discovered

4

that funds would be withdrawn in the form of a company check, negotiated through a check-cashing service and thereby converted into untraceable cash.  This practice of creating multiple transfers between companies is known as "layering" and is the mark of a sophisticated money laundering operation.  Where diverted monies were traceable, agents have determined that the monies were either used to lull some investors into a temporary sense of security by allowing them to realize small returns on investments, while the remainder funded the Hottons' lifestyle, which included pleasure boats registered to others and waterfront property.

Analysis by IRS agents of the criminal and civil fraud claims currently pending against Hotton indicates that his victims have lost over $15 million.  In reconstructing Hotton's operation from banking records, agents found that more than $7 million was run through Hotton shell companies through the layering fashion described above and then converted to cash.  Approximately $3.5 million remains unaccounted in any domestic bank account identified by investigators thus far.

Former business and close social associates of Hotton told federal agents that Hotton traveled overseas several times and expressed an interest in moving money to off-shore accounts, specifically the Cayman Islands.  International travel records from 2007 through 2010, as well as interviews with witnesses who have traveled with Hotton, establish that Hotton made almost ten international trips during this period of time.  Witnesses report that he also used his 50 foot yacht the "Hott Catch" for a number of off-shore trips.

The weight of the evidence against Hotton, his history and his character, strongly militates in favor of detention.  Beyond the probable cause findings in two separate cases made by a grand jury and independent Magistrate Judge, Hotton's conduct in judicial proceedings leading up to today's arrest evidences a voracious appetite for perjury to continue his predatory financial crimes.

Hotton repeatedly represents himself as a financial advisor, yet he was forced in early 2012 to surrender his Series 7 stockbroker's license after amassing a 42-page disciplinary record from the Financial Industry Regulatory Authority ("FINRA").

On February 5, 2011, seeking to stay the various law
suits pending against him, Hotton filed for personal bankruptcy
in the Eastern District of New York.  In re: Chapter 7  Mark C.
Hotton, Debtor, Dkt No. 11-70638 (AST)(EDNY).  During that
petition, the United States Bankruptcy Trustee, despite five
separate filings by Hotton allegedly listing all his assets, all
under oath, found multiple instances of perjury, false statements
and intentional omissions by Hotton.  In addition to the lies
documented by the Trustee, federal agents have discovered that
Hotton has concealed from his bankruptcy petition an additional
$198,000 in assets in the form of two motor vehicles and the
yacht described above from the Bankruptcy Court.[2]

Hotton's many victims include several individuals who
are neighbors.  During his arrest today, one of those neighbors
(hereafter John Doe 1) approached federal agents and advised that
he had recently complained to Hotton about money that John Doe 1
and his wife had lost in a recent, apparently fraudulent,
investment scheme through Hotton.  John Doe 1 then  told agents
that after making these complaints, on Saturday, October 13,
Hotton approached a John Doe 1's wife in his car, yelled that he
was "going to kill" her and swerved his car towards her.  John
Doe 1 has indicated that Hotton has used his car to do this a
number of times and they are afraid for their own safety as well
as their children.

Since Hotton has been the subject of recent press
reports that he was under investigation, multiple new fraud
victims have contacted the government from California to Alaska.
One such victim, a business investor described how, just in the
past week, despite agreements to the contrary, Hotton "cleaned
out" the business' bank account, taking $20,000 and leaving the
victims unable to pay bills.

### Dangerousness to the Community

The Bail Reform Act of 1984 states that a judge may
detain a defendant if that defendant's release "will endanger the
safety of any other person or the community."  18 U.S.C. §
3142(e).  The Bail Reform Act's concept of dangerousness, while

---

[2] That boat was purchased by Hotton through a bank loan Hotton
obtained by forging the name of a close friend and assuming his
identity.  When the friend, whose identity was misused to secure
the loan confronted Hotton, the defendant at first denied the
fraud and later admitted to doing "a quick boat deal" that
amounted to identity theft and bank fraud.

creating a presumption in cases of violent crimes and narcotics distribution, may in some instances also encompass so-called white collar frauds, dangerousness is not limited to such cases. A defendant may be found to pose a danger to the community not only when he commits acts of violence, but when he is likely to commit non-violent crimes that harm the community as well.   See S. Rep. No. 225, 98th Cong., 2d Sess. 22, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3195 (stating, "language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").   Thus, "[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate."   United States v. Colombo, 777 F.2d 96, 98-99 (2d Cir. 1985).

Under similar circumstances to the one at bar, the Second Circuit recently held that a defendant's submission of a materially false submission to the court poses a severe threat to the court's processes and creates a presumption in favor of detention in a post-conviction scenario.   United States v. Bartok, 2012 WL 1034645 (2d Cir. Mar. 29, 2012).

Here the risk that Hotton continues to pose a danger to the community through continued fraud, looting of investor and corporate assets, and money laundering is evident. See 18 U.S.C. § 3142(g)(4).  Hotton's history of fraudulent schemes, his willingness to lie under oath to the Bankruptcy Court, his ongoing efforts to hide assets, all weigh against his release.

Risk of Flight

As for the question of flight risk, two factors strongly favor detention: the defendant's incentive to flee to avoid a lengthy prison term as well as the threat that he has already squirreled away considerable resources overseas that would enable him to remains outside of this Court's jurisdiction.

Where the evidence of guilt is strong, as here, it provides "a considerable additional incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").   In this case, Hotton's incentive to flee would certainly be heightened.

The possibility of a severe sentence is also an important factor in assessing a defendant's incentive to flee.  See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); Martir, 782 F.2d at 1147 (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight,"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

Here, should the Court conclude that dangerousness alone is insufficient to detain the defendant, and that conditions may be imposed to mitigate the risk of flight, the government respectfully submits that any proffered collateral should equal or exceed the total amount of Hotton's frauds, which is in excess of $15 million.

The Second Circuit has previously reversed a district court's decision to release a defendant where the proposed amount was dwarfed by the amount of money embezzled in the defendants fraudulent scheme.  See United States v. Londono-Villa, 898 F.2d 328, 329 (2d Cir. 1990) (reversing release on bail based on flight risk where bail proposed amounted to much less than the money potentially involved in the crime).  Where the amount embezzled is not able to be determined accurately, courts have erred on the side of caution and ordered the defendants detained. See also United States v. Amico, 2006 U.S. Dist. LEXIS 60996 (W.D.N.Y. 2006) (defendant found to be a flight risk where large amounts of money went unaccounted for in multi-million dollar fraud scheme). See also United States v. Lugo-Rios, 2006 U.S. Dist. LEXIS 49657 (D.P.R. 2006) (defendants found to be a flight risk where the amount of money stolen from health care fraud scheme could not be determined).

8

IV.   <u>CONCLUSION</u>

       For the reasons set forth above, as well as any
additional facts that the government will present at the
detention hearing, the defendant should be held without bail
pending trial.

                                  Respectfully submitted

                                  LORETTA E. LYNCH
                                  United States Attorney

        By:   _____

                                  BURTON T. RYAN, JR.
                                  Assistant U.S. Attorney

cc:   Defense Counsel of Record